**UNITED STATES of America**

v.

**PAPERCRAFT CORPORATION, a Pennsylvania Corporation, Appellant.**

**No. 75–2052.**

United States Court of Appeals,
Third Circuit.

Argued May 6, 1976.

Decided July 9, 1976.

Abe Fortas, Fortas & Koven, Ian D. Volner, Cohn & Marks, Washington, D. C., J. Tomlinson Fort, James H. Hardie, Pittsburgh, Pa., Eric F. Stoer, Washington, D. C., Reed Smith Shaw & McClay, Pittsburgh, Pa., for appellant.

Thomas E. Kauper, Asst. Atty. Gen., Robert B. Nicholson, Robert J. Wiggers, Attys., Department of Justice, Washington, D. C., for appellee; Joseph J. Gercke, Assistant Director, Bureau of Competition, Wayne E. Kaplan, Ronald Baylor Rowe, William L. Haynes, Attys., Federal Trade Commission, Washington, D. C., of counsel.

Before ALDISERT, GIBBONS and GARTH, Circuit Judges.

### OPINION OF THE COURT

ALDISERT, Circuit Judge.

This appeal requires us to review a civil penalty assessed against Papercraft Corporation for failure to comply with a divestiture order of the Federal Trade Commission. The district court set the penalty at $7,500 for each of 509 days of determined noncompliance—for a total penalty of $3,817,500.[1] We reverse and remand.

### I.

As the case comes to us, the historical facts are not in dispute. In late 1967, Papercraft acquired the stock of CPS Industries, Inc. In 1969, the FTC issued a complaint alleging that the acquisition violated § 7 of the Clayton Act, 15 U.S.C. § 18. Ultimately, the Commission found that CPS had been the largest and Papercraft had been the second largest manufacturer in the gift-wrap industry, and that the acqui-

sition, resulting in a combined market share of 22 per cent in an industry tending toward concentration, had eliminated substantial competition in violation of the Act. The FTC therefore ordered Papercraft to divest CPS and enjoined Papercraft from acquiring interests in any gift wrapping concern for a period of 10 years. Papercraft petitioned the United States Court of Appeals for the Seventh Circuit for review. The court, per then-Judge Stevens, modified the FTC order but, for all purposes here relevant, affirmed. *Papercraft Corp. v. FTC*, 472 F.2d 927 (7th Cir. 1973).

Some five months after the decision of the Seventh Circuit, the FTC issued its amended order, requiring divestiture within six months of service of the order on Papercraft, *i. e.*, by December 16, 1973. For various asserted reasons, including poor market conditions, Papercraft did not divest by December 16, 1973.

By letter dated December 3, 1973, however, the company requested a nine-month extension from the Commission. The FTC responded by letter dated January 16, 1974. This letter related:

> The Commission, for lack of a majority vote, has not granted your request for an extension of time, and advises that Papercraft is under a continuing obligation to divest the CPS facilities as required by the order.
>
> The Commission further notes that the methods and objective of compliance efforts have been unsatisfactory. You are directed to consult the Compliance staff for further direction.

Appendix at 95 [hereinafter cited as App.].

Papercraft thereafter filed a second request for an extension of time,[2] stating, *inter alia*, "[t]he Commission has not proceeded against Papercraft because of the expiration of time originally allowed for divestiture and we know of no present intention on the part of the Commission to do

---

1. The district court's opinion granting summary judgment for the United States is reported at 393 F.Supp. 408 (W.D.Pa.1975); the court's opinion setting the penalty is reported at 393 F.Supp. 415 (W.D.Pa.1975).

2. The request was dated February 27, 1974 but was not received until March 4, 1974.

so." App. at 97. By letter dated March 29, 1974, the Commission denied this request and said:

> You are hereby advised that it is the Commission's opinion that Papercraft Corporation is in violation of the provisions of the order in the captioned matter. Papercraft Corporation is further advised that it has a continuing and immediate obligation under the order to effectuate the required divestiture. The Commission's right to seek enforcement of the order through a civil penalty or contempt proceeding for any past, present, future or continuing violation of the order is hereby expressly reserved.

App. at 108.

Papercraft continued to be unable or unwilling to divest. Accordingly, on August 27, 1974, the Department of Justice commenced the instant action in the Western District of Pennsylvania seeking a mandatory injunction of divestiture and the maximum daily civil penalty for noncompliance with an FTC order—$10,000. 15 U.S.C. § 45(l).

The district court granted the government's motion for partial summary judgment on the issue of Papercraft's violation of the FTC order. 393 F.Supp. 408 (W.D.Pa. 1975). After conducting a hearing on the amount of the penalty to be assessed, the court determined: that it could assess a penalty of up to $10,000 a day, pursuant to the FTC Act, notwithstanding that the original complaint issued under the Clayton Act; that "the penalties must be sufficient to (1) eliminate the benefit which Papercraft has had through its failure to divest CPS; (2) compel it to divest; and (3) create a deterrent to further delay in compliance, so that others will not choose a like course in the future"[3]; that Papercraft did not exercise "good faith" in seeking to divest; and that Papercraft's

profits from the retention of CPS had to be disgorged, both as a measure of the injury to the public and as a discouragement to potential future violators of divestiture orders. The court concluded:

> In considering Papercraft's financial ability to pay, and the harm caused by the delay, the degree of bad faith, and the benefit received by Papercraft, we do not think that the penalty assessed should be the maximum, however, it must be large enough to deter Papercraft and anyone else in the future from showing as little concern as Papercraft did for the need to meet the FTC timetable.
>
> A penalty of $7,500 a day is determined to represent a fair consideration of all of the factors involved, for a total of $3,817,-500.[4]

On appeal,[5] Papercraft presses three basic contentions. First, it argues that the district court erred in assessing penalties under the FTC Act, which has a maximum daily fine of $10,000, rather than under the Clayton Act, which has a maximum daily fine of $5,000. Second, Papercraft urges that the district court erred in using December 16, 1973 as the date from which to calculate the penalty. Third, Papercraft argues that the district court erred in applying the relevant criteria to fix the daily penalty at $7,500. Specifically, the company contends that the court erred in its considerations of the "public interest" and of "good faith", and that it "relied upon clearly erroneous findings, reasoning and conclusions as to Papercraft's 'profits' and their relevance". Appellant's Brief at 16–17.

We will treat these arguments seriatim.

## II.

Before delving into the three tendered issues, we deem it helpful to emphasize exactly what is before us, and the standards that govern our review.

---

3. 393 F.Supp. at 420.

4. Ibid. at 427.

5. Although immaterial to our decision, we note that Papercraft has informed the court by brief that, since docketing this appeal, Papercraft

has completed divestiture of CPS. "An agreement to sell the stock was executed on November 26, 1975. It was filed with the Commission on December 5, 1975, and was formally approved on February 3, 1976." Reply Brief at 2.

We are not here concerned with whether Papercraft did violate the Clayton Act. The Seventh Circuit opinion is controlling on that score for purposes of this appeal.

Nor are we confronted with a question as to whether Papercraft violated the divestiture order. The district court granted summary judgment on the issue of noncompliance. Of course, the order was interlocutory in nature. On this appeal from final judgment, however, Papercraft does not contest the district court's resolution of liability.

Rather, this appeal is limited to issues concerning the *penalty* for violation of the divestiture order. Specifically, we are concerned with the *maximum penalty* applicable, the *date* from which that penalty should be calculated, and the *amount* of the total penalty assessed in light of several factors.

The maximum penalty issue turns on whether the district court applied the proper provision of law—on whether it chose the proper legal precept. *See generally* R. Aldisert, The Judicial Process 464–92 (1976). Accordingly, our scope of review is plenary.

The date issue depends on a factual determination of *when* Papercraft violated the divestiture order. The narrative or historical facts are not in dispute and what amounted to a violation is a question of law. Thus, we are in as good a position as the trial judge to consider it.

With respect to the amount issue, the Supreme Court has instructed:

[T]he District Court has discretion to determine the amount of the penalty for each violation whether the transactions are construed as single or as continuing violations. Thus, while totaling the penalty as a series of daily violations rather than as a single violation could raise substantially the total penalty assessed, the statutory scheme does not require that result, and the trial judge's determination would prevail in the absence of an abuse of discretion.

*United States v. ITT Continental Baking Co.*, 420 U.S. 223, 229 n. 6, 95 S.Ct. 926, 931, 43 L.Ed.2d 148 (1975). Thus, on the amount issue, we may upset the district court's determinations if we conclude that they are arbitrary or unreasonable, or if we find error in the identification and application of relevant criteria or clearly erroneous findings of fact. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 115 (3d Cir., 1976) (in banc); *Merola v. Atlantic Richfield Co.*, 493 F.2d 292, 295 (3d Cir. 1974).

### III.

The maximum penalty issue is easily stated: If the FTC adjudicates that a company's acquisition of another firm violates § 7 of the Clayton Act, and if the acquiring company violates an FTC order of divestiture, should the penalty be assessed with reference to the maximum permitted by the Clayton Act, 15 U.S.C. § 21(*l*),[6] or with reference to the maximum permitted by the FTC Act (FTCA), 15 U.S.C § 45(*l*)?[7]

Prior to 1973, this question would have held academic interest, at best, for the max-

---

6. Any person who violates any order issued by the commission or board under subsection (b) of this section after such order has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of any such order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the commission or board each day of continuance of such

failure or neglect shall be deemed a separate offense.

7. At present, 15 U.S.C. § 45(*l*) provides:
 Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States. Each separate violation of such an order shall be a separate offense, except that in the case of a violation

ima were identical—$5,000 for each violation. See notes 6–7 *supra*. In 1973, however, and as a result of a rider to the Trans-Alaska Pipeline Authorization Act,[8] Congress increased the maximum penalty under the FTCA for each violation to $10,000. In this case, therefore, the question bears a price tag of more than one million dollars.

The district court's treatment of the issue was abbreviated:

> The Government's suit was brought under both the Federal Trade Commission Act and the Clayton Act. Section 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), authorized a penalty of not more than $5,000 for each violation. Under Section 11(*l*) of the Clayton Act, 15 U.S.C. § 21(*l*), a penalty of not more than $5,000 for each violation was established. The maximum penalty for violation of Section 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), has since been increased from $5,000 to $10,000. *See*, Pub.L. 93–153, Title IV, § 408(c), 87 Stat. 591, 592 (1973). These statutes must be read *in pari materia*. *Federal Trade Comm'n v. Cement Institute*, 333 U.S. 683, 690, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *Federal Trade Comm'n v. Reed*, 243 F.2d 308 (7th Cir. 1957). Thus, maximum penalties of $10,000 per day are available as contended for by the Government.

393 F.Supp. at 417–18 (footnotes omitted). We are constrained to take a closer look at the statutory schema.

■ At the outset, we observe that we decline the invitation of the parties to engage in a war of competing canons of statutory construction. By now, it should be clear that no single canon should operate with talismanic effect. *See* Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed*, 3 Vand.L.Rev. 395, 401–06 (1950). Rather, the judicial function in cases of statutory construction or interpretation is to discern the intent of the legislature. *See Train v. Colorado Public Interest Research Group, Inc.*, —— U.S. ——, ——, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). *See also* Murphy, *Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts*, 75 Colum.L.Rev. 1299 (1975). This judicial duty obtains even when there is no clear manifestation of such intent. *Brown v. General Services Adm'n*, —— U.S. ——, ——, 96 S.Ct. 1961, 1964, 48 L.Ed.2d 402 (1976);[9] *United States v. Bornstein*, 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514, 44 U.S.L.W. 4078, 4080 (1976).

### A.

Section 7 of the Clayton Act prohibits one corporation engaged in commerce from ac-

---

through continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.

Prior to a 1973 amendment, 15 U.S.C. § 45(*l*) provided:

> Any person, partnership, or corporation who violates an order of the Commission to cease and desist after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of

such an order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission each day of continuance of such failure or neglect shall be deemed a separate offense.

**8.** Federal Lands Right-of-Way Act of 1973, Pub.L. No. 93–153, 87 Stat. 576.

**9.** "Congress simply failed explicitly to describe [the position of § 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16] in the constellation of antidiscrimination law. We must, therefore, infer congressional intent in less obvious ways. As Chief Justice Marshall once wrote for the Court, '[w]here the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived . . . .' *Fisher v. Blight*, 2 Cranch 358, 386 (1805)."

quiring the stock or, if the corporation is subject to FTC jurisdiction, the assets of another corporation also engaged in commerce where the effect of such an acquisition may be substantially to lessen competition or tend to create a monopoly. 15 U.S.C. § 18. Section 11 of the Clayton Act vests certain federal regulatory agencies—specifically, the Interstate Commerce Commission, the Civil Aeronautics Board, the Federal Communications Commission, the Federal Reserve Board and the FTC—with authority to enforce enumerated sections of the Clayton Act, including § 7. 15 U.S.C. § 21(a), (b). Section 11(b) prescribes the procedures by which the regulatory agencies initiate and prosecute such Clayton Act adjudications. 15 U.S.C. § 21(b). Section 11(c) provides for judicial review of final agency orders from such adjudications. 15 U.S.C. § 21(c). Section 11(*l*) sets forth the penalty for violation of a final agency order under § 11(b). 15 U.S.C. § 21(*l*); see note 6 *supra*. Thus, on its face, § 11 establishes a mechanism for agency adjudication of Clayton Act violations that appears both thorough and complete—providing authority to act, guidelines for processing the charges, rules for determining finality of orders, and penalties for violations of final orders.

 Congress enacted the Federal Trade Commission Act in 1914 to supplement the general antitrust laws. *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307 (1922). The heart of the new Act was § 5 which declared unlawful "unfair methods of competition"[10] and empowered the Commission to obtain cease and desist orders. At first, the exact role of the FTC in the constellation of antitrust law was uncertain. *FTC v. Gratz*, for example, held that the words "unfair method of competition" were "clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder com-

petition or create monopoly." 253 U.S. 421, 427, 40 S.Ct. 572, 575, 64 L.Ed. 993 (1920). Eventually, however, the dissenting views of Mr. Justice Brandeis prevailed. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–44, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). Accordingly, it is now settled that the Commission, in combatting "unfair methods of competition" or "deceptive practices", is not limited to those methods or practices condemned by the letter or spirit of the antitrust laws. *Ibid.* at 244, 92 S.Ct. 898; *FTC v. Brown Shoe Co.*, 384 U.S. 316, 320–21, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966); *FTC v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 394–95, 73 S.Ct. 361, 97 L.Ed. 426 (1953).

Section 5 of the FTCA tracks the format of § 11 of the Clayton Act. Thus, § 5(b) states the general procedure governing an unfair competition or deceptive practice proceeding, § 5(c) provides for judicial review of a final FTC order under § 5, and § 5(*l*) sets forth the penalty for violating a final FTC order. 15 U.S.C. § 45(b), (c), (*l*). On its face, then, § 5 establishes a mechanism for the FTC to police "unfair methods of competition" and "unfair or deceptive acts or practices", which, like the Clayton Act § 11 mechanism, appears to be complete and self-contained.

While the parallelism of the subsections within the statutes is remarkable, several differences command our attention. First, § 11(b) provides that, if the agency is of the view that the Clayton Act has been violated, it "shall issue and cause to be served on such person an order requiring such person to *cease and desist* from such violations, *and divest* itself of the stock, or other share capital, or assets, held . . . in the manner and within the time fixed by said order." 15 U.S.C. § 21(b) (emphasis added). The comparable provision in the FTCA states that if the FTC finds an unfair method of competition or deceptive practice, it "shall issue and cause to be served on such person . . . an order requiring such

---

**10.** Section 5 now extends also to "unfair or deceptive acts or practices". 15 U.S.C. § 45(a)(1).

person . . . to *cease and desist* from using such method of competition or such act or practice." 15 U.S.C. § 45(b) (emphasis added).

The other differences relate to the penalty sections. Compare notes 6 and 7 *supra.* The Clayton Act provides a maximum penalty of $5,000 for each violation of an order under subsection (b). The FTCA formerly provided for an identical $5,000 penalty for each violation of a final cease and desist order. The current subsection (*l*), however, provides a $10,000 maximum for each violation of "an order of the Commission after it has become final", without explicit limitation to cease and desist orders. Amended subsection (*l*) also empowers the district courts to grant mandatory equitable relief in furtherance of FTC orders. A final distinction is that the 1973 amendments to the FTCA added a subsection (*m*), empowering the FTC, when authorized to appear in court, to appear in its own name upon giving the Attorney General 10 days notification of its intent so to do. This distinction has no bearing on this case, however, which was brought by the United States.[11]

■ Based on a careful review of the statutory schema prior to the 1973 FTCA amendments, we believe that Clayton § 11 and FTCA § 5 constituted separate and distinct weapons in the government's antitrust arsenal.[12] The FTC could choose to employ either in appropriate circumstances. Once having selected the statute under which to act, however, the Commission would have recourse to the same statute for enforcement.[13]

In this case, the FTC moved against Papercraft under Clayton § 11 and obtained a final order of divestiture which, in relevant part, the Seventh Circuit affirmed. We must now decide whether the 1973 amendments altered the rules under which the FTC could seek enforcement of its final order. Specifically, we must decide whether § 408(c) of the Alaska Pipeline bill—which amended § 5(*l*) of the FTCA by increasing the penalty from $5,000 to $10,000 and by eliminating the words "to cease and desist"—implicitly repealed or superseded so much of Clayton § 11(*l*) as set the maximum penalty for violation of an FTC order under Clayton § 11(b) at $5,000. Accordingly, we turn to an analysis of the legislative history of the 1973 FTCA amendments.

### B.

In 1973, the United States experienced unprecedented peacetime natural gas and oil shortages. In some quarters, the "energy crisis", as it came to be known, was thought a deliberate contrivance on the part of the major oil companies to drive small independent operators out of business and thereby increase the dominance of the major firms. *See* 119 Cong.Rec. 21443 (1973) (remarks of Senator Jackson). The staff of Senator Henry M. Jackson, chairman of the Committee on Interior and Insular Affairs, corresponded with the staff of

---

11. The hasty adoption of subsection *m* in 1973, see *infra,* caused some confusion as to the appropriate roles of the FTC and the Department of Justice. Accordingly, subsection *m* was amended in 1975. H.R.Rep.No.93–1107, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News 7702, 7731–32; *see* S.Conf.Rep. No.93–1408, 93d Cong., 2d Sess., 1974 U.S. Code Cong. & Admin.News 7755, 7770–71. That provision, however, is not relevant to this appeal, for this action was commenced in 1974 and the 1975 amendments do not apply to any action commenced before the date of enactment, Jan. 4, 1975. Pub.L.No.93–637, § 204(c), 88 Stat. 2199.

12. Thus, we disagree with the district court's statement that the statutes treat the same sub-

ject matter and therefore must be construed together, *i. e.,* that they are *in pari materia. See* Black's Law Dictionary 936 (3d ed. 1933). Their similarity is confined to the most generic sense.

13. Our conclusion in this important respect is buttressed by the realization that Clayton Act § 11 differs significantly from other statutes which, while empowering the FTC to act in certain fields, specifically incorporate the enforcement provisions of the FTCA. *See, e. g.,* Textile Fiber Products Identification Act, 15 U.S.C. § 70e; Flammable Fabrics Act, 15 U.S.C. § 1194; Truth in Lending Act, 15 U.S.C. § 1607.

the FTC about the latter's ability "to deal with situations comparable to the [then-] current petroleum emergency." *Ibid.* at 21445 (letter from FTC general counsel Ronald M. Dietrich to Senator Jackson). The FTC indicated that its powers were broad enough to discover such problems in their incipiency, but that the shortcomings of the FTC's power were "in the potential for delay in existing subpoena enforcement procedures and in [the FTC's] inability to obtain preliminary relief once the problem has been fully discovered." *Ibid.* Accordingly, the FTC sought "statutory authority to seek directly in the federal district courts preliminary injunctions against the continuance of anticompetitive conduct ('unfair methods of competition') as well as deceptive practices, and the corresponding statutory authority to proceed to federal district court itself to enforce its own subpoenas and to require reports from businesses under Section 6(b) of the Federal Trade Commission Act." *Ibid.*

The consequence of the above described correspondence was S. 2074, styled "a bill to amend the Federal Trade Commission Act in order to grant the Commission authority to directly enforce subpoenas issued by the Commission and to directly seek preliminary injunctive relief to avoid unfair competitive practices which violate laws enforced by the Commission." *Ibid.* at 21435.[14] S. 2074 was referred to committee on June 26, 1973. Shortly thereafter, however, Senator Jackson offered the substance of the bill as an amendment to the then-pending Trans-Alaska Pipeline bill. Without debate, the Senate overwhelmingly agreed to the amendment as offered on July 10, 1973. *Ibid.* at 22981.

The House version of the Pipeline bill contained no cognate to the Senate FTCA amendments.[15] The joint conference adopted the Senate version. When the conference bill was called for debate in the House, opposition to the FTCA amendments focused not so much on the merits of the measures as on the propriety of accepting "non-germane amendments" which had not been subjected to full scrutiny in the House. *See generally ibid.* at 36595–36618.

Supporters of the bill in the House emphasized the benefits that would accrue to consumers and small businessmen from having an FTC capable of taking speedy action against unfair competitive practices. *See ibid.* at 36596–97 (remarks of Representative Melcher); *ibid.* at 36608 (remarks of Representative Smith); *ibid.* at 36616 (remarks of Representative Holtzman); *ibid.* at 36618 (remarks of Representative Gude). The FTCA amendments were denominated "housekeeping improvements". *Ibid.* at 36612 (remarks of Representative Dingell). Section 408(c), the section increasing the maximum civil penalty, was described as more "in the nature of a *modernization rather than a revision,* made necessary by twenty-five years of inflation since the $5,000 limit was prescribed in 1938. The provision in no way affects the Commission's substantive authority." *Ibid.* at 36609 (remarks of Representative Johnson) (emphasis added).

Our review of the available legislative materials leads us to the following deductions. In passing the 1973 FTCA amendments, Congress was concerned with two problems: (1) increasing the Commission's ability to deal quickly with incipient unfair methods of competition and deceptive practices, and (2) providing the Commission with a means of enforcing its requests for vital information. The only evidence of the

---

14. At a news conference while the proposal was pending, Senator Jackson reiterated that the purpose of the bill was to empower the FTC to go to court for subpoena enforcement and preliminary injunctive relief. "This authority will circumvent the delays experienced in the past when the Commission was required to request and persuade the Justice Department to go to Federal Court on the Commission's behalf." 119 Cong.Rec. 22980 (1973).

15. Representative Dingell had introduced a bill, H.R. 5847, to amend the Federal Trade Commission Act by providing for "temporary injunction or restraining orders for certain violations of that Act." 119 Cong.Rec. 8674 (1973). The House bill, however, was not reported from the Committee on Interstate and Foreign Commerce.

congressional intent in increasing the maximum daily civil penalty indicates that that amendment was technical, not substantive—necessitated by 25 years of inflation since the last legislative action with respect to the FTC penalty.

■ Far from evincing a clear legislative intent that the amended FTCA § 5(*l*) supplant Clayton § 11(*l*)'s enforcement provision for violations of FTC orders under Clayton § 11(b), the history of the 1973 FTCA amendments reflects hasty congressional action. Passage of the Pipeline authorization bill—viewed as a potential means to alleviate national dependence on foreign oil—was the primary concern. Increasing the FTC's powers was a subsidiary concern, and was limited to the above-enumerated areas. We conclude therefore that the 1973 amendment to FTCA § 5(*l*) did not supersede so much of Clayton Act § 11(*l*) as sets the maximum daily civil penalty for violation of an FTC order under Clayton Act § 11(b) at $5,000.[16]

■ The FTC successfully challenged Papercraft's acquisition of CPS under Clayton Act § 11(b). In seeking civil penalties for violation of the resultant divestiture order, the Commission was authorized to proceed under Clayton Act § 11(*l*). Accordingly, we hold that the district court erred when it assessed Papercraft's penalty with reference to FTCA § 5(*l*)'s maximum of $10,000 per violation.[17]

**16.** Mindful that "post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage," *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974), we note in passing that in this case post-passage congressional studies only serve to bolster our view of the congressional intent behind the 1973 FTCA amendments. *See* S.Conf.Rep.No.93–1408, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin. News 7755, 7771–72; H.R.Rep.No.93–1107, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin. News 7702, 7713–14, 7716.

**17.** The government suggests that an interpretation such as that we reach would be incongruous, permitting only a $5,000 penalty for a full-blown anti-trust violation, but a $10,000 penalty for a violation of the broader FTCA § 5.

## IV.

We need not belabor the date issue. The documents make plain that the FTC ordered Papercraft to divest itself of CPS by December 16, 1973. Papercraft failed to do so. The company, therefore, was guilty of a violation of the divestiture order each day it continued in its failure to divest, *unless* it obtained an extension from the FTC.

■ Papercraft applied for an extension on December 3, 1973. No response was forthcoming until January 16, 1974. Thus, as Papercraft argues, the FTC did not deny the request for an extension. It is equally true, however, that the FTC did not grant the extension. In these circumstances, we deem it within the district court's authority to conclude that Papercraft violated the divestiture order when it failed to divest by December 16, 1973. Nothing in the subsequent correspondence between Papercraft and the FTC detracts from this view. Nor is this a case in which Papercraft argues that it received an informal extension of time in which to comply. Accordingly, we hold that the district court's conclusion as to the date from which to assess the penalty was not clearly erroneous.

Our holding on the maximum penalty issue requires that the proceedings be remanded to the district court. We deem it appropriate, therefore, to add certain suggestions which the district court will be free to accept or reject at its discretion. Our

The short answer, of course, is that this result is not incongruous if, as we have found, Congress so intended. Nor is such an intent unreasonable. For instance, Congress might determine that there should be a $10,000 penalty for violating cease and desist orders which, by and large, are capable of prompt compliance; on the other hand, Congress might determine that the $5,000 figure should obtain for violations of divestiture orders under the Clayton Act, because divestiture cannot be accomplished overnight. Lastly, the government's argument itself leads to an incongruity, for it would permit the FTC to collect $10,000 for each violation of an order stemming from Clayton Act § 11, but relegate the ICC, the FCC, the Federal Reserve Board and the CAB, which agencies proceeded under the same statute, to penalties of $5,000 for each violation.

review of this case leaves us with the impression that while Papercraft did not expend every effort it might have to achieve timely compliance, neither did the FTC exert maximum pressure on Papercraft to assure timely compliance. We reject appellant's contention that, as a matter of law, the FTC waived its right to seek enforcement and civil penalties between December 16, 1973 and March 29, 1974, or was estopped to do so.

Nevertheless, in these peculiar circumstances, we leave open to the district court various possibilities as to the imposition of penalties. That the district court originally did not impose the full maximum penalty of $10,000 per day may have been a recognition of the failure of the FTC to assure timely compliance. We leave to its discretion whether similarly the maximum daily penalty of $5,000 should not be imposed. Further, we recognize that the district court might be disposed toward imposing different daily penalties for the violations of the divestiture order—*i. e.,* one penalty might obtain for the period from December 16, 1973 to March 29, 1974, and another, higher one for the period after March 29, 1974.

### V.

Papercraft attacks the amount of the penalty assessed from several angles.

First, Papercraft argues that this penalty was "so enormous and so far beyond any precedent, that its size, in and of itself, raises doubt as to the soundness of the Court's exercise of its discretion in this case." Appellant's Brief at 36. That the largest penalty previously assessed in a divestiture case was $200,000 and that the largest penalty for violation of any FTC order was $465,000, *see ibid.,* are simply irrelevant considerations, given the statutory maximum and our scope of review. Appellant's arguments to the contrary are more properly addressed to the Congress.

Next, appellant argues that while the district court identified the proper

factors to be considered in assessing the civil penalty, viz., those articulated by Judge Friendly in *United States v. J. B. Williams, Co.,* 498 F.2d 414, 438–39 (2d Cir. 1974), it departed widely from the standards in purporting to apply them. We agree with Judge Friendly that "the size of the penalty should be based on a number of factors including the good or bad faith of the defendants, the injury to the public, and the defendants' ability to pay." *Ibid.* at 438. Papercraft argues, however, that the district court equated Papercraft's profits with the extent of the public harm. Papercraft argues that no case prior to this one measured public harm in this manner. That may be. While we need not decide the issue, we note that the Supreme Court last Term stated that "violations [of Clayton Act § 11(*1*) and FTCA § 5(*1*)] share two discernible characteristics: [1] the detrimental effect to the public and the advantage to the violator of each continues and increases over a period of time, and [2] the violator could eliminate the effects of the violation if it were motivated to do so, after it had begun." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 231, 95 S.Ct. 926, 932, 43 L.Ed.2d 148 (1975). Thus, while no court assessing penalties previous to the district court equated public harm with the measure of the violator's profits during the violation, the Supreme Court appears to have made just such an equation. Accordingly, we cannot say the district court abused its discretion in this respect. Papercraft also challenges the district court's calculation of its profits. We need not inquire into this argument other than to note that in its opinion on the motion to reconsider, the district court observed that a substantial penalty was warranted in these circumstances, irrespective of profits. See App. at 206–08. We find that the district court did not abuse its discretion in its meticulous analysis on the "good faith" issue.

The judgment of the district court will be reversed and the cause remanded for further proceedings in accordance with the foregoing.