UNITED STATES of America, Plaintiff,

v.

ACB SALES & SERVICE, INC., et
al., Defendants.

No. CIV 80–251 PHX CLH.

United States District Court,
D. Arizona.

April 29, 1987.

Anita Johnson, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, D.C., Roger Fitzpatrick, Christopher Keller, for plaintiff.

Warren C. Ridge, Phoenix, Ariz., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HARDY, District Judge.

The Government brought this action against ACB Sales and Services, Inc., its subsidiaries and individual officers, alleging violations of Title VIII of the Consumer Credit Protection Act, which is popularly known as the Fair Debt Collection Practices Act, 15 U.S.C. § 1692–1692o, ["the Act"] and for violations of a 1974 order of the Federal Trade Commission ["the Order"]. Trial of the disputed issues of fact was to the Court. This memorandum shall be deemed the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

### I. Organizational Structure of ACB Companies

The corporate defendants are individual corporations that do business as "The ACB Companies" and are engaged in the collection of debts as third-party collection agents. ACB Sales and Services, Inc. is responsible for selling ACB's services to creditors. Actual collection efforts are undertaken by ACB local offices, which are separately incorporated as subsidiaries of ACB Sales and Services, Inc. ACB Management Services, Inc. provides administrative management and accounting services to the local offices.

ACB started in 1947 in Phoenix, Arizona, as a small collection agency. The increasing popularity of oil company credit cards caused it to grow to where it now has 28 local offices and is the third or fourth largest collection agency in the United States. ACB's clients include federal, state and local governments, major corporations and financial institutions, issuers of national and local credit cards, and educational institutions.

ACB typically does not receive an account for collection until the creditor has spent several months attempting to collect it. All accounts for collection are first received by ACB's home office in Phoenix, from which a collection letter is sent to the debtor. If the letter fails to produce payment, the account is then transferred to the local office nearest to the debtor.

Each local office is managed by a general manager. There is a collection manager

to supervise the work of the individual collectors. The number of collectors in the local offices varies from ten to sixty. ACB selects its managers from the ranks of the collectors.

Each local office has a "revenue budget," which specifies the minimum amount of money that the office is expected to collect each month.

Collectors work on a commission basis with a draw against commissions. They normally work eight-hour shifts during the hours the local offices are open which are between 8:00 in the morning and 8:30 in the evening, except where an office collects amounts in two time zones, in which case the office closes at 8:00 pm. Collection activities are pursued through letters and telephone calls. Each collector has an alias that he uses in dealing with debtors.

It is generally ACB's policy not to institute legal action against a debtor unless it has received written authorization from the creditor-client. Some creditor-clients specifically instruct ACB that it is not to resort to legal action to enforce collection.

If a collector has tried and failed to obtain payment of a debt by informal methods, he may recommend to his office manager (or in some offices to the office manager's designee) that legal action be instituted against the debtor. If the office manager agrees, the matter is referred to the home office. If the home office agrees, it asks the client whether the client wishes to institute legal action. If the client wishes legal action, a written authorization to do so is given to ACB. The matter is then referred back to the local office. If the local office manager concludes that legal action is still appropriate, he then refers the matter to an attorney for collection. If collection is effected by legal action, the collector who worked the account receives no commission.

## II. The Order

The Order was issued on December 4, 1974, pursuant to an agreement with the ACB Companies and with Jerry Middleman, Jack G. Schwartz and Jerry Raker, individually and as officers of the corporation.

Among other things, the Order required the ACB Companies and their officers to cease and desist from:

1. "Representing directly or by implication, . . . that legal action has been, is being or will be taken against a debtor." (Par. 2)

2. "Representing directly or by implication, . . . contrary to fact or law, that failure by any debtor to pay amounts requested will result in garnishment of wages or attachment of property of the debtor." (Par. 3)

3. "Misrepresenting, in any way, the remedies available to the [ACB Companies] or to creditors or the defenses available to debtors in the jurisdiction in which collection is sought." (Par. 3)

4. "Representing directly or by implication, . . . that failure by any debtor to pay amounts requested will result in criminal action by law enforcement authorities." (Par. 5)

5. "Placing telephone calls to any alleged debtor at his place of employment or appearing in person at any alleged debtor's place of employment," with certain exceptions. (Par. 6)

6. "Misrepresenting to any debtor, in any manner, the position or function of any of [ACB's] agents or employees." (Par. 7)

7. "Placing of any telephone call to any debtor between the hours, in the time zone of the debtor, of 9:00 o'clock P.M. and 8:00 o'clock A.M. on week days, including Saturdays, and between the hours of 9:00 o'clock P.M. on Saturdays and 11:00 o'clock A.M. on Sundays, without first receiving permission from such debtor to call during those hours." (Par. 8)

8. "Communicating or threatening to communicate, or implying the fact or existence of any debt to a debtor's employer prior to any judgment, unless specifically called for by or necessary to a procedure prescribed by statutes." (Par. a)

9. "Communicating with or threatening to communicate, or implying the fact or existence of any debt to any other third parties, including former employers, other than one who might be reasonably expect-

ed to be liable therefor, except with the written permission of the debtor." (Par. b)

The Order also required the ACB Companies, to "deliver a copy of this order to all present and future personnel engaged in collection procedures and secure a signed statement acknowledging receipt of said order from each such person. Furthermore, [ACB] shall instruct said employees or agents that the practices prohibited by this order are against [ACB's] business policy and that engagement in said practices will result in dismissal."

Finally, the Order required the ACB Companies to file with the Commission within 60 days a written report "setting forth in detail the manner and form in which they have complied with this order."

### III. ACB Compliance with Order

On February 6, 1975, ACB submitted to the Commission its Report of Compliance. Annexed to the report were copies of all letters, forms, notices, and other materials used by ACB to attempt to collect delinquent accounts.

The Commission's Division of Compliance responded to the report on March 7, 1975. The response rejected some of ACB's forms because they did not comply with the requirements of the Order or were ambiguous.

ACB revised, discontinued or restricted the use of each of the forms rejected by the Division of Compliance and reported this to the Commission in a Second Report of Compliance on October 10, 1975.

By letter dated December 12, 1975, the Commission informed ACB that "The Commission has reviewed the Report of Compliance and has concluded, on the assumption that the information submitted is accurate and complete, that no compliance action is indicated at this time." The letter further stated: "The Commission takes this action on your assurance that none of the forms which it considers to be violative of the order are currently used and that form revisions will be made as represented in the Second Report of Compliance dated October 10, 1975, and in the letter from your counsel dated November 6, 1975. Use of

any of the rejected forms in the future could subject you to an action for civil penalties as provided by law." The November 6, 1975, letter had informed the Commission that future notices would use the language "We are not representing either directly or by implication that legal action has been or is being taken against you at this time."

The Division of Compliance made no objection to ACB's form letter 003. In its Memorandum Opinion and Order of June 19, 1984, the Court ruled that "Letter 003 clearly threatens legal action against the debtor."

### IV. 1977 FTC Review of Compliance

By letter dated April 12, 1977, ACB was informed that the Commission was conducting a compliance check, and was requested to provide:

1. Sample copies of "all stationery, letters, forms, notices, and other instruments used to attempt to collect accounts and/or used to locate debtors, during the period from December 12, 1975, to the present."

2. A copy of each past and present employee's signed statement that he/she has read and will comply with the consent order.

3. "The name, last known address, and phone number of all persons employed by [ACB] on and from January 6, 1975, to date, who are no longer employed by same."

4. All instructions given to employees engaged in collection procedures subsequent to January 6, 1975, other than those previously submitted to the Commission, regarding tactics, methods and company policies and procedures employed in collecting or attempting to collect accounts.

5. All records kept by employees engaged in collection procedures.

On June 1, 1977, ACB provided the Commission with all of the materials and information requested except the name, last known address and phone number of all persons employed by ACB on and from January 6, 1975. When that omission was

called to its attention on September 1, 1977, the additional information was provided.

On August 14, 1977, the Commission authorized an investigation regarding compliance by ACB with the December 4, 1974, order. In response to a subpoena duces tecum issued on February 3, 1978, ACB produced additional documents and information. In addition, the Commission staff was permitted to examine files at ACB's office in Phoenix, Arizona.

By letter dated December 8, 1978, the Commission informed ACB's counsel in Washington, D.C.:

> "The Commission believes that [ACB's form, "48 Hour Notice"] constitutes a representation that 'legal action ... will be taken.' Use of this notice would violate paragraph 2 of the above-referenced Commission order if, in fact, the taking of such legal action is not actually intended or if respondents are not authorized to take such action when this notice was sent out."

ACB then discontinued the use of the "48 Hour Notice."

### V. The Act

The Federal Debt Collection Practices Act became effective on March 20, 1978. It contained an express congressional finding that "[t]here is abundant evidence of the use of abusive, deceptive and unfair debt collection practices by many debt collectors." Section 802(a). One of the stated purposes of the Act was "to eliminate abusive debt collection practices by debt collectors." Section 802(e).

The Act does not use the term "debtor," but a "consumer" is defined as "any natural person obligated or allegedly obligated to pay any debt." Section 803(3). Guidelines for communicating with consumers and third parties are prescribed. Section 805. Harassment or abuse of "any person in connection with a collection of a debt" is proscribed, Section 806, as are false and misleading representations in connection with the collection of a debt. Section 807.

### VI. Teaching Compliance to ACB Employees

After the Order was issued, meetings were held at all local offices to explain the requirements of the Order to the employees. All persons who were employed at that time and all who have been employed since then were required to endorse a copy of the Order to signify that he read it. The copy was then placed in his personnel file. Another copy was given to each employee so that he could have it for ready reference.

After the enactment of the Act on September 20, 1977, the requirements of the Order and of the Act and ACB policy were combined into a document known as "ACB Rules of Professional Conduct" [the "Rules"]. Each ACB employee has been required to sign a copy of the Rules, which has been placed in his personnel file, and has been given a copy to have at his desk for ready reference.

Meetings were held throughout the country to educate ACB employees in the requirements of the Act. ACB acquired instructional tapes on the requirements of the Act, which were produced by the American Collectors Association, a national trade association of collection companies. All ACB employees were required to listen to the tapes. ACB also purchased booklets explaining the Act from the American Collectors Association for distribution to its employees.

ACB has training programs not only for its collectors but also for its collection managers and branch general managers.

Supervision of collectors includes monitoring their telephone calls.

An audit program was initiated in 1980. Auditors go to the local offices and go through files, paperwork and the desks of collectors and other areas in the operation. They are charged with insuring that all collectors understand their role and function. The primary purpose of the auditing is to insure that ACB employees are complying with the Order, the Act and ACB policies.

"Unusual" complaints by debtors are investigated by the general manager of the local office, who prepares a written response and forwards the complaint and the response to the home office. Branch managers are also required to forward to the home office all complaints from regulatory agencies and other government offices, from lawyers and from legal aid offices.

ACB regularly sanctions employees for violations of company policy. In September 1980 and January 1983 ACB supplied to the Commission the names of 35 employees who had been terminated for violation of ACB policies.

VII. Violations of Order and Act

Notwithstanding ACB's efforts to insure compliance with the Order and Act, the Federal Trade Commission and state agencies received hundreds of complaints of improper collection practices. In three states —Colorado, Illinois and Pennsylvania—proceedings commenced to revoke the licenses of the ACB Companies were settled by consent decrees. The FTC's investigation of these complaints led to this action.

An order of February 18, 1982, as modified by an order of September 24, 1982, granted partial summary judgment that "the defendants" had violated the Order and the Act in attempting to collect 62 accounts. On January 19, 1984, partial summary judgment was granted adjudging that (1) ACB Companies had mailed 440 letters to consumers that represented directly or by implication that legal action would be taken against the debtor to enforce collection in violation of Paragraph 2 of the Order and Section 807(5) of the Act, and (2) that "maverick" collectors had violated various provisions of the Order and the Act.

■ At trial, the evidence included testimony regarding fourteen collection accounts, deposition testimony regarding twenty-nine collection accounts, deposition testimony regarding the seventeen maverick accounts, deposition testimony by nine former ACB collectors and deposition testimony by two former ACB managers. With two exceptions (Eileen Anders, a debtor, and Sally Collins, a former collector), the Court finds the testimony of the Government's witnesses to be credible.

The evidence establishes a pervasive pattern of violations so numerous they cannot be dismissed as simply the work of a few maverick collectors. In many cases managers or supervisors joined with collectors in committing violations.

The very nature of ACB's operations impels its employees to disregard the Order and the Act in attempting to collect debts. The manager of each collection office is under pressure to meet his revenue budget, the amount his office is expected to collect each month. He knows that the failure to meet his budget will result in his being removed as manager of the office. Consequently, he presses his collectors to collect more money.

A collector is under additional pressure because his income is based upon commissions. If his commissions do not meet his monthly draw, he may lose his job. If he wants to increase his income, above his draw, he must collect more money. The more quickly a collector can persuade a debtor to pay, the more time he will have to work on the collection of other accounts. When a debtor expresses an inability to pay immediately, the collector must do something to persuade the debtor that he must make payment. Collectors are instructed that debtor emotions to work on are fear, pride and sense of accomplishment. (See Exhibit 89j.) The evidence suggests that collectors work on debtors' fears more than anything else.

■ Any debtor who was unable or unwilling to make payment as demanded by a collector subjected himself to a torrent of abuse and harassment. He or she may have been cursed or otherwise verbally abused. Obscene and profane language was used. (But the Court does not regard "damn" or "hell" as either obscene or profane.) The collector may make repeated telephone calls—many on the same day, often within minutes of each other; many day after day. In some cases collectors threaten violence to the debtors. All of

these were violations of Section 806. Additionally, there were many telephone calls made by collectors between 9:00 at night and 8:00 in the morning on week days, in violation of Paragraph 8 of the Order and Section 805 of the Act.

Another standard, almost invariable tactic was to threaten, directly or impliedly, that legal proceedings would be commenced to enforce collection—filing a lawsuit, garnishing wages, attaching property, or impressing a lien upon property. Such threats were violations of Paragraphs 2 and 3 of the Order if they were "contrary to fact" and violations of Section 807 if the debt collector did not intend to take such action. There was ample evidence that debt collectors threatened legal action without intent to take such action.

Former collectors Esparza, Kreitner, Newbold and Peay testified that whenever a debtor indicated that he was unable to make immediate payment, a threat of legal action was routinely made and that only occasionally were recommendations made to commence legal proceedings. Very few of the debtors who were threatened with legal proceedings were ever sued.

At least three of ACB's clients—Denver Department of Health and Hospitals, LaSalle Extension University and North American Correspondence School—had instructed ACB not to bring suit to enforce collection against their debtors. By letter dated August 10, 1978 (Exhibit 9) Denver Department of Health and Hospitals complained to ACB that "We have received repeated information that individuals were being told that, if they do not pay, the matter will be referred for legal action."

Another circumstance indicating a lack of intent is that internal procedures to initiate legal action were only occasionally commenced.

Finally, the fact that a collector earns no commission when an account is referred for legal action supports a finding that routine practices of threatening legal action were employed with no intent to actually commence such action.

In some cases collectors threatened, directly or impliedly, that criminal prosecution would be instituted against consumers, in violation of Paragraph 5 of the Order and Section 807(3).

There were frequent threats to inform the debtor's employer that the debtor was not paying his bills, which was a violation of Paragraph a of the Order and Section 807(5). There were also threats to inform others of the debt, and there were occasions when the fact of debt was communicated to third persons, usually neighbors, both in violation of Paragraph b of the Order and Section 805(b). There were frequent telephone calls to debtors' places of employment after the debtors had requested that they not be called there, in violation of Paragraph 6 of the Order.

Collectors violated Paragraph 7 of the Order and Section 807 by misrepresenting that they were an attorney, a legal adviser, a friend of the debtor and an employee of a creditor. A frequent misrepresentation in violation of Section 807 was that an emergency existed that required the collector to get in touch with the debtor immediately.

Although there was evidence that debt collectors failed to disclose their identity in violation of Section 806(6), that a debt collector misrepresented himself as an attorney in violation of Section 807(3), that a debt collector misrepresented his identity in violation of Paragraph 7 of the Order, and that debt collectors made false representations in violation of Section 807(10), there were not enough of these violations to establish a company-wide pattern of collection misconduct.

VIII.  Remedies

Contending that there have been over 1,000 violations of the Act and the Order, the Government seeks assessment of a civil penalty of $500,000 and the imposition of injunctive provisions. While the Court has made no effort to quantify the number of violations, it does appear that the Government's 1,000 violation figure is reached by considering many actions as constituting violations of both the Act and the Order and of more than one provision of the Act

and of the Order. Nonetheless, the number of violations is substantial.

### A. Civil Penalty

A civil penalty of up to $10,000 for each violation of the Order and the Act is authorized. 15 U.S.C. § 45(*l*) and (m)(1)(a); § 814(a).

■ Civil penalties are appropriate to deter future violations by the offender and others, *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 232, 95 S.Ct. 926, 932, 43 L.Ed.2d 148 (1975); *United States v. Phelps Dodge Industries, Inc.*, 589 F.Supp. 1340 (D.C.N.Y.1984). Among the factors to consider in determining the amount of a civil penalty are the good or bad faith of the defendants; their ability to pay; and the necessity of vindicating the authority of the Federal Trade Commission in deterring further violations, *United States v. Readers Digest Ass'n*, 662 F.2d 955, 967 & n. 18 (3rd Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed. 2d 446 (1982); *United States v. Papercraft Corp.*, 393 F.Supp. 415, 420 (W.D.Pa.1975), *aff'd in part*, 540 F.2d 131, 141 (3rd Cir. 1976).

■ The defendants contend that they made good faith efforts to comply with the Order and the Act. Good faith is not a defense. *United States v. Johnson*, 541 F.2d 710, 712 (8th Cir.1976). However, good faith is a factor to consider in determining the size of any penalty. *United States v. Papercraft Corp.*, 540 F.2d 131 (CA3d 1976). The Court is not satisfied that the individual defendants have acted fully in good faith.

Before trial, the Court ruled that the individual defendants were subject to penalties only for violations of the Order and that the defendant Schwartz would not be assessed any penalty because he had not been active in the management of ACB. The defendant Raker has confined himself to the selling of ACB services and has done nothing to assure that ACB collectors are complying with the Order and the Act. The defendant Middleman has delegated oversight of compliance to another officer, who was not named in the Order.

Until about 1984 there was no procedure by which the ACB home office was informed of all complaints by debtors. Complaints by individual debtors were forwarded to the home office only if the branch managers considered them to be "unusual." By permitting their branch managers to decide which complaints were unusual, Middleman and Raker shirked their duty to assure that collectors were complying with the Order.

■ In fixing an appropriate penalty, the Court has taken into consideration the fact that since the commencement of this action in 1980, there apparently have not been a substantial number of reported violations by ACB. If there had been, the Government almost certainly would have filed a supplemental complaint.

■ At the time of trial, Middleman and Raker both had incomes exceeding $200,000 a year. ACB's annual profits in recent years have exceeded $500,000.

Mr. Middleman and Mr. Raker will each be required to pay a penalty of $25,000 for violating the Order. The ACB Companies will be required collectively to pay a penalty of $150,000 for violating the Order and a penalty of $150,000 for violating the Act.

### B. Injunctive Provisions

■ The Government seeks injunctive relief pursuant to 15 U.S.C. § 53(b), which authorizes a permanent injunction "in a proper case" when a party "is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission." Past violations do not fall within the purview of Section 53(b), *F.T.C. v. Evans Products Co.*, 775 F.2d 1084, 1087 (9th Cir.1985). There has been no showing by the Government that ACB has continued to violate the Order and the Act since this action was commenced in 1980.

Consequently, judgment will be entered assessing penalties against the ACB Companies and Mr. Middleman and Mr. Raker, but injunctive relief will be denied.

### JUDGMENT

Pursuant to the Court's Findings of Fact and Conclusions of Law, IT IS ORDERED, ADJUDGED AND DECREED as follows:

1. That the United States of America is awarded monetary civil damages from the

Defendant Jerry Middleman for violations of the Federal Trade Commission's Order of 1974 in the amount of $25,000.

2. That the United States of America is awarded monetary civil damages from the Defendant Jerry Raker for violations of the Federal Trade Commission's Order of 1974 in the amount of $25,000.

3. That the United States of America is awarded monetary civil damages from the corporate defendants collectively for violations of the Federal Trade Commission's Order of 1974 in the amount of $150,000.

4. That the United States of America is awarded monetary civil damages from the corporate defendants collectively for violations of the Fair Debt Collection Practices Act in the amount of $150,000.

5. That the United States of America take nothing by its complaint against the Defendant Jack J. Schwartz and that judgment be entered in favor of the Defendant Jack J. Schwartz.

6. That the United States of America's prayer for injunctive relief is denied.