**UNITED STATES of America, Plaintiff,**

v.

**DANUBE CARPET MILLS, INC., and Carl D. Hagaman, Defendants.**

**Civ. A. No. C78–70R.**

United States District Court,
N. D. Georgia,
Rome Division.

May 26, 1982.

Benjamin P. Schoen, Atty., Deren E. Manasevit, Consumer Affairs Section, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., Curtis E. Anderson, Asst. U.S. Atty., Atlanta, Ga., for plaintiff.

Richard H. Gimer, Santarelli & Gimer, Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAROLD L. MURPHY, District Judge.

### STATEMENT OF THE CASE

This matter came before the Court on the issue of penalties to be imposed against Danube Carpet Mills, Inc. ("Danube") and its President, Carl D. Hagaman, ("Hagaman") for breach of a cease and desist order issued by the Federal Trade Commission ("FTC") under the Flammable Fabrics Act ("FFA"), 15 U.S.C. § 1191 *et seq.* By orders dated June 29, 1979 and June 18, 1980, this Court earlier determined that Danube and Mr. Hagaman had violated the cease and desist order, and that seven violations had occurred.

This controversy initially began with issuance by the FTC of a draft complaint in which defendants were charged with violating the FFA and § 5(a) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a), by manufacturing a style of carpeting that failed to meet the Carpet Flammability Standard. That dispute ended in the issuance by the FTC of an order to cease and desist with the consent of defendants, which was dated June 22, 1972 and became final on October 13, 1972. The order prohibited defendants from selling, offering for sale, or introducing into commerce any fabric or related material, including carpet, which failed to conform to the Carpet Flammability Standard under the FFA.

Between November, 1974 and March, 1975, the Consumer Products Safety Commission ("CPSC") conducted an investigation of Danube in which a number of rolls of Danube's carpet styles were tested for compliance with the Carpet Flammability Standard. Certain rolls of Brady (foam) carpet manufactured by defendants failed the Carpet Flammability Test.

This civil penalty action was initiated under § 5(a)(1) of the FTCA, 15 U.S.C. § 45(a)(1), against Danube and Mr. Hagaman, individually and as an officer of the company. On March 2, 1979, the plaintiff moved this Court for partial summary judgment on the issue of liability, which was granted on June 29, 1979. The parties submitted legal briefs on the question of number of violations in response to this Court's request, and on June 18, 1980, the Court sustained plaintiff's contention that seven violations, one for each failing roll manufactured or sold, occurred. Defendants filed a motion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) that was denied on September 22, 1980.

On March 29–30, 1982, the parties appeared before this Court for a hearing upon the issue of penalties. The Court heard evidence and the parties submitted proposed findings of fact and conclusions of law. The Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Danube is a Georgia corporation originally chartered in 1960 under the name of Braids, Inc. Since 1962 Carl D. Hagaman has continuously been Danube's sole owner, principal stockholder, and chief executive officer.

2. Danube manufactures tufted carpet. One line of product is directed at the commercial or contract market. Another line of product is directed at the manufactured housing market. The carpets manufactured by Danube are made primarily from synthetic nylon fibers.

3. Danube presently owns and operates a yarn spinning operation. During the investigation in 1974–1975 that led to the complaint in this case, the sole aspect of manufacturing of carpet performed by Danube in its own plant consisted of tufting of the greige goods, *i.e.,* tufting of the face fiber into the primary backing material. The other principal aspects of carpet manufacture are dyeing the face fiber and applying the secondary backing. As is customary in the carpet industry, particularly for small and medium sized firms, both of these latter functions were performed by commission finishers for defendants in 1974–1975.

4. In 1964, Mr. Hagaman hired Charles Housch, a man with significant carpet experience by that time. From 1964–1980, Dan-

ube was operated primarily by division of responsibilities between Mr. Hagaman and Mr. Housch.

5. Carl D. Hagaman is President of Danube Carpet Mills, Inc., at this time and has held such position with Danube since its purchase by him.

6. Hagaman and Danube are named as respondents in a 1972 Cease and Desist Order, FTC Docket No. C–2303 (Order) and are the same entities now before this Court named as defendants in this action.

7. Danube and Hagaman consented to the entry of the Order which became final on October 13, 1972.

8. Hagaman owns 100 percent of Danube stock.

9. Hagaman was named as a respondent in the Order as President of Danube and individually, signed the Order and was responsible for compliance with the Order individually and in his capacity as chief executive officer of Danube.

10. Danube and Hagaman did not change or increase the frequency with which they tested carpeting for flammability after they signed the Order in 1972.

11. Danube and Hagaman did not change or increase the frequency with which they tested carpeting for flammability after the Consumer Product Safety Commission informed Danube and Hagaman that several rolls of Brady style carpet had failed flammability tests.

12. In the years 1972–1981, there was no written policy or guideline within Danube specifying when or how often to test carpeting for flammability.

13. In the years 1972–1981, Danube and Hagaman did not institute a sampling plan which determined if, when, or how often Danube carpeting would be tested for flammability.

14. The carpet style at issue in this proceeding, Brady, was tufted by Danube at its Ft. Oglethorpe facilities, and was printed and backed by commission finishers in the North Georgia area.

15. Commission finishing houses are recognized and established businesses in the carpet industry, and are relied upon for various aspects of the carpet finishing process by mills of all sizes, including the largest carpet mills. Small mills and many medium size mills depend upon outside commission finishers for the dyeing and finishing of most or all of their carpet products.

16. Danube Carpet Mills selects its commission finishers on the basis of the finishers' reputation for performing particular types of work, and engages in discussions with the commission finishers concerning the finishing process in general, and the specifications for finishing of each carpet style in particular. These discussions include an exchange of specifications to be used, understandings concerning the amounts and types of latex to be applied, amounts and types of secondary backings, colors, quantities of chemical flame retardants to be added to the latex precoats or adhesives, if any, and other considerations relevant to the manufacturing process. The commission finishers on occasion test the finished goods to determine their compliance with the Carpet Flammability Standard.

17. Danube monitored the performance of the commission finishers employed by it to dye and finish its greige by having its own employees present at the plant of the commission finishers while Danube's goods were being dyed or finished.

18. A carpet, including Brady-style carpet, consists of the face tufted into a primary backing to which a latex precoat or adhesive is first applied, followed by the application of a foam or a jute secondary backing. The face fiber may be dyed at the time the fiber or yarn is produced, or, at some point, after the goods are in greige form.

19. The first step in the carpet manufacturing process is the tufting of dyed or undyed spun yarns into a primary backing. The resulting product is known as greige. Greige is produced as a part of a tufting run, the length of which is a function of the quantity of yarn being tufted and the den-

sity of the pile. The average tufting run is approximately 6000 linear feet, but it is not unusual to tuft 100,000 pounds of yarn in a single tufting run. Tufting runs are assigned a number for identification purposes.

20. Tufting runs of Brady involved yarn lots of from 20,000–25,000 pounds.

21. The yardage of greige produced in a tufting run is subdivided first into manufacturing rolls, which typically are up to 600 linear feet long.

22. Carpet in greige form is not suitable for sale to consumers insofar as it must be dyed and have a secondary backing applied. For this reason, greige goods are not susceptible of accurate flammability testing in their greige form.

23. Greige is sent to be dyed and finished in the form of manufacturing rolls, or in cuts from such rolls, depending upon a variety of factors, including the type of backing to be applied, the color involved, the amount of orders received, the manufacturers' inventory practices, and the commission house practices with respect to minimum yardage to be finished.

24. Greige rolls have a number assigned to them, and this number is modified as pieces are cut from the manufacturing roll, either for production or for subsequent shipment. After the manufacturing roll is finished, it is subdivided into shipping rolls or pieces and these rolls are assigned new numbers.

25. A carpet consists of yarn, primary backing, latex, and secondary backing. Danube purchases the raw materials used in its carpet from suppliers who produce raw materials and components especially designed for use in the manufacture of carpet. Brady carpet was manufactured from a good quality, 100% continuous filament heat-set nylon manufactured by DuPont. The yarn was tufted into a primary backing. It was commission-finished by a commission house that performs similar services for other mills in the North Georgia area.

26. Danube relied upon raw materials and component inspection, greige goods inspection, monitoring of commission-finishing operations, and final inspections, together with written and oral understandings with its commission finishers to yield an end product satisfactory to Danube.

27. Danube, like most small mills, does not have in-house equipment capable of performing testing for Carpet Flammability and relies upon flammability tests for its product by other parties.

28. A carpet mill's product line typically consists of a series of styles. Styles may be differentiated by name, constructions, fiber type, weight, color line or patterns and dye method. What differentiates one style from another may be structurally significant or it may simply reflect marketing considerations.

29. A style may be kept in a mill's product line for a few weeks or several years. On average, Danube styles remain in the line for no more than a year, with a majority of its styles never reaching production levels in excess of 25,000 linear yards.

30. Carpet yarns receive their color in a variety of ways. Some carpets are produced from pre-dyed yarns which have their color imparted before the greige is ever produced. Other carpets are beck-dyed in greige form, and still others are printed. Danube has employed each of the various types of dyeing methods for its products from time to time, and has sometimes employed a combination of these methods concurrently.

31. Industry practice would recognize use of the same greige goods, dyed or colored by differing dye application methods, with or without a change in style name.

32. During 1973, Danube tufted a quantity of Dupont 100% continuous-filament nylon into greige goods form into a nylon shag carpet with a 12 ounce face-weight. At the time these goods were tufted, they were known by the style name Cason. As originally produced, these materials were finished in solid colors by immersion in a dye beck, to be subsequently sold as Cason. Danube had tested Cason-style carpet for compliance with flammability standards and it met the standard.

33. The opportunity arose to apply the color on the greige using a Stalward printer that gave a different coloring effect. Danube took the Cason greige, finished it utilizing the printer, and in the process changed the name of the finished carpet to Brady.

34. The Cason style and Brady style were identical in all respects except the dyeing application method. Cason was manufactured from greige goods which were beck-dyed while Brady consisted of the identical greige that had its color imparted by a printer.

35. Visual inspection of carpeting cannot reveal whether it meets the standard of flammability.

36. Carpeting is generally tested for flammability according to the color of a carpet because the color of a carpet affects its flammability.

37. Hagaman knew that color affected the flammability characteristics of carpeting.

38. None of the colors of Brady style carpet was tested for flammability.

39. Danube and Hagaman tested Cason style carpet.

40. Brady style carpet had different flammability characteristics from Cason style carpet because it had different colors and a different coloration process than Cason.

41. Hagaman knew that Brady carpet and Cason carpet had different flammability characteristics because the carpets had different colors.

42. Because its colors were different, Brady style carpet was a different carpet from Cason style carpet.

43. Danube and Hagaman manufactured Brady style carpet for sale without any prior testing for flammability.

44. Aluminum Trihydrate (ATH) is the flame retardant generally used by the carpet industry.

45. ATH is mixed into the secondary backing of carpets. The amount of ATH infused into the secondary backing of carpets by a finisher is controlled by the manufacturer of the carpeting.

46. No ATH was put into the backing of Brady style carpet.

47. Danube and Hagaman specified that no ATH be mixed into the foam backing used for Brady style carpet.

48. Approximately fifteen thousand (15,000) square yards of Brady style carpet were manufactured for sale by Danube and Hagaman.

49. Approximately twelve thousand (12,000) square yards of Brady style carpet were sold to consumers.

50. Brady type carpet—12 ounce shag carpet—was typical of the carpet manufactured by Danube and Hagaman for the manufactured home market.

51. No flammability test on Brady style carpet before it was distributed in commerce was made by the finisher of the carpet at the request or direction of Danube or Hagaman.

52. After notification of test failures and a request by the Consumer Product Safety Commission to recall Brady style carpet, Danube and Hagaman recalled Brady style carpet from its distributors.

53. After notification of several flammability test failures Danube and Hagaman ceased production and sale of Brady style carpet.

54. Had the Consumer Product Safety Commission not tested Brady style carpet and found it failed to meet the Standard for Surface Flammability of Carpets and Rugs, Danube and Hagaman would have continued production and sale of Brady style carpet.

55. There is a competitive cost advantage for companies that test less often than for those that test more often and for those that do not add ATH to the secondary backing applied to carpets than for those that do.

56. In the years 1972–1981, Danube and Hagaman did not keep records of all tests for flammability performed on carpeting they manufactured.

57. Danube and Hagaman delegated primary responsibility for flammability testing of Danube carpeting to Charles Housch.

58. Hagaman gave Charles Housch complete discretion to determine if, when, and how often Danube carpeting would be tested.

59. The person now responsible for ensuring Danube carpeting is tested for flammability is Robert ("Bobby") King.

60. Hagaman never showed Robert King a copy of the Order.

61. Danube and Hagaman depended upon the finishers of Danube carpeting for flammability testing and only recently developed a comprehensive testing policy.

62. The only certain way to determine whether a carpet meets the Standard for Surface Flammability of Carpets and Rugs (flammability standard or Standard) is by testing it.

63. As of the time this action came to a hearing on the issue of penalties, the day-to-day responsibility for flammability compliance by Danube has been assigned to an official with over 13 years of experience in the general area of three other mills. This individual, Mr. Bobby King, has been given authority to make such improvements on the Danube flammability compliance program as he sees fit. Several changes have been implemented recently and all of the company's styles and colors are now being retested in order to provide a uniform starting point for the current program.

64. The present Danube flammability compliance program consists of testing each color of each style prior to its initial introduction into commerce, testing of each color and the style at intervals not to exceed 50,000 square yards, testing of each style at intervals not to exceed six months (irrespective of yardage produced), the compilation of a log of cumulative yardage produced, and procedures for retesting and problem identification in the event of test failures.

65. Danube now utilizes ATH, or other chemicals recognized as improving the flammability characteristics of carpet, in its styles where use of such components is indicated.

66. Since Brady style carpet failed the flammability test defendants have not been charged with any other violations of the Order.

67. In March 1975, Danube issued a written recall notice to each of its customers of Brady foam-backed carpet. The notice contained the exact language which had been requested by the staff of the Federal Trade Commission.

68. In the fiscal year November 1, 1978, to October 31, 1979, Danube Carpet Mills, Inc., had net profits of $594,684.

69. In the fiscal year November 1, 1979, to October 31, 1980, Danube Carpet Mills, Inc., had net profits of $376,167.

70. For the fiscal years beginning November 1, 1979, and ending October 31, 1981, Danube Carpet Mills, Inc., had net profits of over $1.2 million.

71. As of October 31, 1981, Danube had a net worth of approximately $3.5 million.

## CONCLUSIONS OF LAW

1. Pursuant to section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), plaintiff United States is entitled to recover civil penalties from the defendants.

2. Under 15 U.S.C. § 45(a)(1), the United States is entitled to receive a civil penalty of up to $10,000 for each violation of the 1972 FTC Cease and Desist Order.

3. Pursuant to this Court's ruling of June 17, 1980, the defendants committed seven violations of the Order.

4. As President of Danube and as the signatory to the Consent Order, Carl D. Hagaman was ultimately responsible for testing Danube carpets for flammability.

5. Danube and Hagaman are jointly liable for violations of the Order, and for payment of any monetary penalty assessed for those violations.

6. The Flammable Fabrics Act authorizes the issuance of a flammability standard when the Secretary of Commerce finds

**514**

such a standard is needed to "protect the public against unreasonable risk of fire leading to death or personal injury, or significant property damage...." Section 4(a), Flammable Fabrics Act, 15 U.S.C. § 1193(a).

7. A flammability standard must be based on a finding that the standard "is needed to adequately protect the public against unreasonable risk of the occurrence of fire leading to death, injury or significant property damage [and] is reasonable, technologically practicable and appropriate...." Section 4(b), Flammable Fabrics Act, 15 U.S.C. § 1193(b).

8. The Standard for Surface Flammability of Carpets and Rugs was issued based on the findings enumerated in paragraph 7 above.

■ 9. The criteria by which to determine the size of a penalty and to implement the Congressional purpose of the FTC Act are: (1) The injury to the public resulting from a violation; (2) the defendant's ability to pay penalties; (3) the good or bad faith of the defendant in violating the order; (4) the desire to eliminate the benefits derived by the defendant from its violative activities; and (5) the necessity of vindicating the authority of the Federal Trade Commission by deterring similar behavior by others. *See, e.g., United States v. Reader's Digest Association, Inc.*, 494 F.Supp. 770 (D.Del.1980), aff'd., 662 F.2d 955 (3rd Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982); *United States v. J. B. Williams Co.*, 498 F.2d 414 (2nd Cir. 1974); *United States v. Papercraft Corp.*, 393 F.Supp. 415, 420 (W.D.Pa.1975), *aff'd in part*, 540 F.2d 131, 141 (3rd Cir. 1976).

10. The receipt by consumers of carpet that does not meet the Standard causes public harm by subjecting the public and consumers to an unreasonable risk of fire leading to death, injury and significant property damage.

11. The receipt by consumers of approximately 12,000 square yards of Brady style carpet caused significant public harm.

12. Pursuant to the Flammable Fabrics Act, section 3(b), 15 U.S.C. § 1192(b), the manufacture for sale and sale of carpet that does not meet the flammability standard is an unfair method of competition and a deceptive act or practice in commerce under the Federal Trade Commission Act.

■ 13. The receipt by consumers of carpet that does not meet the Standard causes public harm by subjecting the public to an unfair method of competition and a deceptive act and practice. *See United States v. Reader's Digest Association, supra.*

■ 14. The failure of Danube and Hagaman to institute a sampling plan and guidelines with regard to frequency of testing carpeting for flammability after the Order became final indicates a lack of good faith in complying with the Order and subjected the public to harm from carpeting that failed to meet the Standard.

15. The fact that the "greige" was the same for Brady style and Cason style carpet did not provide Danube and Hagaman with reasonable basis for failing to test Brady style carpet for flammability before manufacturing and selling it, since Brady style and Cason style carpets had different colors and therefore different flammability characteristics.

16. The failure of Danube and Hagaman to test Brady style carpet for flammability prior to manufacturing and selling it indicates a lack of good faith in complying with the Order.

17. The failure of Danube and Hagaman to specify and ensure that a flame retardant was put into the secondary backing of Brady style foam-backed carpet indicates a lack of good faith in complying with the Order, and subjected the public to physical injury and harm.

18. The failure of Danube and Hagaman to keep complete and accurate records of all flammability tests conducted on Danube carpeting indicates a lack of good faith in complying with the Order.

19. The complete delegation of authority with respect to if, when and how often

Danube carpeting would be tested from Danube and Hagaman to finishers or Mr. Charles Housch indicates a lack of good faith in complying with the Order.

20. The failure of Danube and Hagaman to change, modify, or increase the frequency of testing after the Cease and Desist Order was entered in 1972 until recently indicates a lack of good faith in complying with the Order.

21. Danube and Hagaman benefited competitively and financially from their failure to institute a sampling plan for testing carpet for flammability, failure to specify that ATH be put in the foam backing of Brady carpet, failure to regularly test carpeting for flammability during 1972–1975, and failure to keep complete and accurate records of all tests for flammability.

22. The conduct of each defendant authorizes the imposition of penalties within the limits authorized by law.

23. Failure to violate the order since the recall of Brady and the recent institution of a planned and organized Flammability Testing Program abrogates any need to impose maximum penalties or injunctive relief.

24. Danube and Hagaman have the ability to pay a monetary penalty of $3500.00 per violation or a total penalty of $24,-500.00.

25. A monetary penalty of $3500.00 for each of the violations or a total monetary penalty of $24,500.00 against Danube and Hagaman jointly, without the granting of injunctive relief is adequate to serve the purposes of the act under the circumstances of this case and is within the ability of defendants to respond thereto without substantially impairing the solvency of either defendant.

26. The fact that all violations of the flammability standards by defendants occurred within one style of defendants' production militate against the imposition of any penalty greater than that found appropriate by the Court in these findings and against the injunctive relief sought.

ACCORDINGLY, penalties in the amount of $3,500.00 per violation for a total of seven violations amounting to $24,500.00 will be imposed upon the defendants jointly and plaintiff's prayers for injunctive relief are DENIED.