**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**DANUBE CARPET MILLS, INC., and
Carl D. Hagaman,
Defendants-Appellants.**

**No. 82–8456.**

United States Court of Appeals,
Eleventh Circuit.

July 30, 1984.

---

Santarelli & Gimer, Richard H. Gimer, M. Stuart Madden, Washington, D.C., for defendants-appellants.

Richard H. Gimer, Washington, D.C., for intervenor.

William J. Roberts, Barry Grossman, Nancy C. Garrison, Benjamin P. Schoen, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., Curtis E. Anderson, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before RONEY, FAY and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Appellants,[1] Danube Carpet Mills, Inc. (Danube) and its president, Carl D. Hagaman (Hagaman), appeal from an adverse summary judgment ruling in a civil penalty action instituted under the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45(a)(1). The government alleged that appellants violated a consent decree that they had entered into with the Federal Trade Commission (FTC). Appellants and the FTC entered into the agreement pursuant to a FTC investigation of the appellants' carpet manufacturing operations which revealed nonconformance with the flammability standard, established in the Flammable Fabrics Act (FFA), 15 U.S.C. § 1191 et seq.[2] The district court, 540 F.Supp. 507 (D.C.Ga.1982), held that appellants had committed seven separate violations of the decree and ordered them to pay a civil penalty of $3,500 for each violation.

We have jurisdiction. 28 U.S.C. §§ 1291 & 1294 (1982).

## I.

### A. The Regulatory Framework

The FFA authorized the Secretary of Commerce (Secretary) to promulgate standards to protect the public against the risks associated with flammable fabric products. 15 U.S.C. § 1193. The Secretary promulgated a carpet flammability standard effective April 16, 1971. This standard is codified at 16 C.F.R. § 1630.1–.5. The manufacture, distribution or sale of products which fail to conform to this standard is a violation of the FFA, 15 U.S.C. § 1192.

Congress originally entrusted the FTC with enforcement of the FFA but in 1973 transferred such authority to the Consumer Product Safety Commission (CPSC).[3] Apparently, neither the FTC nor the CPSC issued a binding regulation or published a policy statement which would have guided carpet manufacturers in their attempt to comply with the flammability standard. The FTC did, however, promulgate "Guaranty Regulations" which prescribed "reasonable and representative tests" to support any guaranties which manufacturers may voluntarily have issued under FFA § 8, 15 U.S.C. § 1197.[4] These "Guaranty Regulations" required testing at three stages of production: (1) at the inception, (2) after production of the first 100,000 square yards, and (3) after production of every 200,000 square yards thereafter. 16 C.F.R. § 302.15(c). Separate testing is required under these regulations for each "quality" of carpet as defined in 16 C.F.R. § 302.15(a)(6). Essentially, a line of carpets constitutes a separate "quality" for purposes of the testing requirement if it is not "substantially alike" another line of carpets in those respects enumerated at 16

1. The Carpet and Rug Institute has intervened in this appeal on appellants' behalf. Danube, Hagaman, and the intervenor-appellant are represented by the same counsel and have submitted a single brief.

2. The FFA was, as originally enacted, limited in its application to wearing apparel, but was amended to cover both "wearing apparel" and "interior furnishings." Pub.L. No. 90–189 (1967).

3. 15 U.S.C. § 2079(b).

4. See 16 C.F.R. § 1630.31(a), (c).

C.F.R. § 1630.31(a)(6). It should be noted that "Guaranty Regulations" were not binding upon Danube because appellants (as was true of most carpeting mills at the time) had not issued FFA § 8 guaranties. They were, nevertheless, the only published evidence of the enforcing agencies' concept of a reasonable testing program under the flammability standard, and, therefore, Danube, like many other mills, referred to the "Guaranty Regulations" for guidance in their attempt to comply with the standard. Appellant's Brief at 12.

### B. Danube's Business Operations

Danube is a carpet manufacturing company located in Georgia. As a smaller firm, Danube is involved only in the primary stage of carpet production, which involves the tufting of carpet yarns or "face fiber" into a primary backing. The resulting product, known as "greige," is suitable neither for sale to customers nor for flammability testing. Appellant's Brief at 9. Therefore, Danube contracts with "commission finishers" who perform the remaining stages of production. These commission finishers perform according to Danube's instructions. Once the finishers have completed their portion of the manufacturing process, the carpet is suitable for flammability testing. Because Danube does not possess the in-house capability to test the completed product, it must either instruct the finisher to conduct testing or contract with an outside testing laboratory. Appellant's Brief at 5.

### C. The 1972 Consent Order

One method of FFA enforcement is the filing of administrative complaint proceedings to secure cease and desist orders, the subsequent violation of which exposes the respondent to civil penalties under FTCA § 5(l), 15 U.S.C. § 45(l). After a FTC investigation revealed that one sample of a carpet style manufactured and sold by Danube failed a flammability test, both Danube and its president, Mr. Hagaman, became signatories to such an administrative order.[5] This order provides, in pertinent part, that appellants shall not manufacture for sale, sell or distribute any carpeting that fails to conform "to an applicable standard or regulation continued in effect, issued or amended under the provisions" of the FFA. On October 13, 1972, the FTC approved the decree, and it has continued in force and effect from that date to the present.

### D. Violation of the Order

During 1973, Danube tufted a quantity of DuPont nylon into "greige" for use in a nylon shag carpet, known as "Cason." In 1974, Danube adopted a different coloring process for "Cason": printing as opposed to immersion in a dye beck. With the adoption of this new coloring process, Danube changed the carpet's name from "Cason" to "Brady." Although "Cason" and "Brady" were identical save for the coloring process, the newly adopted coloring process adversely affected the flammability characteristics of the previously tested and approved "Cason" product. Appellants manufactured about 15,000 square yards of "Brady" carpet, of which approximately 12,000 square yards were sold to consumers.

Between November 1974 and March 1975, the CPSC investigated Danube's compliance with the flammability standard. Seven rolls of appellants' "Brady" carpet failed the test.[6] On June 10, 1977, the CPSC certified to the Attorney General facts indicating that the consent order had been violated, and on November 25, 1977, the United States Department of Justice filed a complaint seeking civil penalties for seven violations of the decree.[7]

---

5. Appellants entered into the agreement with the FTC on June 22, 1972, before the complaint was issued.

6. The testing method employed, known as the "Pill Test," is set forth at 16 C.F.R. § 1630.4 (1984).

7. The CPSC has enforcement authority under the FFA and the FTCA; however, the Commission usually prosecutes cases for civil penalties through the Department of Justice. *In re Imperial Carpet Mills, Inc., et al.,* CPSC Dkt. No. 80–2, 3 Cons. Prod. Safety Guide (CCH) ¶ 75.319 at 60,970 n. 23 (1983).

### E. Proceedings Below

On March 2, 1979, the CPSC moved for partial summary judgment on the issue of whether appellant had violated the consent decree. On June 29, 1979, the court granted the motion without an evidentiary hearing. At the court's request, the parties submitted legal briefs on the question of the number of violations. On June 18, 1980, the court granted judgment in accordance with the government's contention that seven violations had occurred, i.e., one for each roll of "Brady" carpet which failed the flammability test.[8] On March 29–31, 1982, the parties appeared before the district court for a hearing on the appropriateness of penalties. By Order dated May 26, 1982, the court ordered defendants Danube and its president, Hagaman, to pay a civil penalty of $3,500 per violation for a total of seven violations, amounting to a jointly imposed penalty of $24,500.

### II.

Appellants raise numerous issues in this appeal, only a few of which merit discussion. Two of appellants' principal contentions arise because the district court decided this case on the government's motion for summary judgment. Appellants argue that summary judgment was inappropriate because the affidavits they submitted and sworn answers to interrogatories raised a triable issue of material fact concerning the presence of a violation, and because the trial court incorrectly construed the consent decree in finding seven separate violations. Appellants next argue that the district court erred in assessing civil penalties. Finally, Hagaman challenges the imposition of personal liability against him as president of Danube.

### III.

### A. Summary Judgment

In determining whether appellants had violated the consent decree, the district court considered whether the seven rolls of carpet described in the complaint violated the order by failing to conform to the flammability standard. Appellants contend that the issue is not simply whether the seven specified rolls were nonconforming, but whether an unspecified majority of "Brady" samples failed to meet the standard. In other words, appellants argue that if their affidavits demonstrated that a majority of the products of the type at issue conformed to the standard, a triable issue of fact existed as to the existence of a violation.

To support its motion for summary judgment, the government presented affidavits by CPSC officials demonstrating that all seven rolls of carpet had been sampled and tested in accordance with the carpet flammability regulations and that each roll had failed the test. In opposition, appellant submitted the affidavit of its president, Mr. Hagaman, which stated that Danube had tested "Brady" style carpet for compliance with the flammability standard; however, this affidavit did not controvert the CPSC's test results as to the seven rolls of carpet involved in this case. The district court ruled that, regardless of the successfulness of flammability tests conducted on other "Brady" style carpet, Mr. Hagaman's affidavit raised no factual issue concerning the accuracy of the CPSC's test on the seven rolls listed in the complaint. (R. 357).

 Clearly, the district court's ruling is correct if the focus is on only those rolls of carpet listed in the complaint, rather than a "representative sample" of a certain style of carpeting, such as "Brady." Because the question of what constitutes a violation of a FFA carpet order is a case of first impression, neither party submits any authority in support of its contention. Appellants simply argue that it is inappropriate to attribute greater significance to an isolated failing test than to a representative passing test made in the ordinary course of business. Appellants' Brief at 22. We

---

8. Defendants' motion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) was denied on

September 22, 1980.

agree with the government's contention, however, that evidence as to the compliance of other products is a factor to be considered only in determining the appropriate amount of civil penalties, not in establishing the existence of a violation. Accordingly, the district court did not err in finding no triable issue of fact as to the existence of a violation.[9]

Appellants next contend that summary judgment was erroneous because the trial court improperly excluded extrinsic evidence that was necessary to resolve alleged ambiguities in the 1972 cease and desist order relevant to the number of violations. Under the order in question, appellants were to "cease and desist from ... manufacturing for sale ... any product made of fabric or related material as ... 'product', 'fabric' and 'related material' are defined in the [FFA], ... which product, fabric or related material fails to conform to [the flammability standard]." Appellants contend that the term "any product" as used in the order is ambiguous because, in their view, it refers to *styles* of carpet rather than individual rolls. The government, on the other hand, contends that the term "any product" is unambiguous and, therefore, the court did not err in refusing to examine extrinsic evidence.

Reference to extrinsic evidence to construe a consent order is proper only where the language is ambiguous. *Robinson v. Vollert*, 602 F.2d 87, 92 (5th Cir. 1979), *reh'g denied*, 609 F.2d 1177 (5th Cir.1980). The order in this case specifically provides that the term "product" is used as it is defined in the FFA. The FFA defines "product" as *"any article* of wearing apparel or interior furnishing," and further defines "interior furnishing" as "any *type of furnishing* made in whole or in part of fabric or related material...." 15 U.S.C. § 1191(h), (e) (emphasis added). The government contends that, because a roll of carpet is a "type of furnishing," the meaning of "any product" includes carpet rolls. Government's Brief at 21. We agree. The court's construction provides a logical interpretation of the consent order, and no extrinsic evidence was necessary.

## B. Civil Penalties

In determining the amount of the penalty, the district court considered (1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendants' ability to pay; (4) the desire to eliminate the benefits derived by the violations; and (5) the necessity of vindicating the authority of the FTC.[10] Appellants challenge the

---

**9.** Contrary to Hagaman's statement in his affidavit, the district court found that *no* Brady style carpet was tested. Finding of Fact 38. Given our position as to the effect of evidence of other products that comply with the standard, this apparent conflict is immaterial. The fact remains that the affidavit did not controvert the CPSC's tests conducted on the seven rolls of Brady carpet named in the complaint, and, therefore, there was no triable issue as to the existence of a violation. Furthermore, because the affidavit states neither the nature nor frequency of the alleged testing, it does not conflict with the district court's finding that appellants had no plan or program to conduct tests at regular time or output intervals.

**10.** These criteria were developed in well-reasoned opinions from the Third and Second Circuits. *See United States v. Reader's Digest Ass'n*, 662 F.2d 955, 967 & n. 18 (3d Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982); *United States v. J.B. Williams Co.*, 498 F.2d 414, 438–39 (2d Cir.1974); *United States v. Papercraft Corp.*, 393 F.Supp. 415, 420

(W.D.Pa.1975), *aff'd in part*, 540 F.2d 131, 141 (3d Cir.1976).

The CPSC has articulated a non-comprehensive list of factors which the Directorate for Compliance and Administrative Litigation should consider when deciding whether to seek a civil penalty or determining the amount of the penalty to seek for violation of a cease and desist order:

(1) Whether the individual or firm established and maintained an adequate program of pre-production flammability testing of each carpet style; (2) whether the individual or firm established and maintained an adequate program of flammability testing at regular intervals during production of each carpet style; (3) when a failing test result was received, whether the individual or firm undertook immediate, adequate, and appropriate remedial action (*e.g.*, halted production, retested as appropriate, notified distributors and retailers, stopped shipment of the style(s) that fail to comply, and in appropriate cases issued public notification concerning the flammability of the carpet); (4) the degree, if

district court's findings as to the first three considerations.[11]

### 1. *Good Faith*

■ Appellants contend that the district court abused its discretion in imposing substantial civil penalties in light of alleged good faith efforts to comply with the order and prompt remedial action upon discovery of the violations. The record supports the district court's finding to the contrary. Appellants did not have a policy or plan to test carpeting at regular time intervals or at periodic output intervals; appellants did not change their policy of random flammability testing after the consent agreement. Furthermore, Danube's president, Mr. Hagaman, delegated testing responsibility to a subordinate who did not keep any accurate records of the flammability tests. Moreover, while appellants ceased production and sale of Brady style carpet and recalled it from distributors after the CPSC gave notice of test failures, the district court found that appellants would have continued production and sale of the nonconforming carpet had the CPSC not tested Brady style carpet.[12] The district court's finding as to appellants' "good faith" was not error.

### 2. *Public Harm*

■ The district court concluded that "the receipt by consumers of approximately 12,000 square yards of Brady style carpet caused significant public harm." Conclusion 11. Appellants contend that this finding is erroneous because appellants have made an unrebutted showing of lack of actual injury or loss to the public and the appellee has, in turn, failed to show any actual injury. (Reply Br. at 22). Appellants rely on *United States v. Chevron Oil Co.*, 583 F.2d 1357, 1363–64 (5th Cir.1978), an action for civil penalties under the Federal Water Pollution Control Act Amendments of 1972 (FWPCA), in which an oil company responsible for an oil spill presented evidence that the spill was not harmful, even though it caused a "sheen" on the water, and the government did not produce rebuttal evidence to establish that the spill was in fact harmful. Under these circumstances, the former Fifth Circuit held that the oil company was not liable for civil penalties. *Id.* On the other hand, appellee relies upon *United States v. Reader's Digest Ass'n, Inc., supra* note 10, 662 F.2d, at 969, an action for civil penalties under the FTCA, in which the court held that if the information reaching the public possessed the capacity to deceive, "the Government was not obligated to adduce evidence of specific injuries to consumers."

We find that the rule in *Reader's Digest* governs this case. The FFA, like the FTCA, protects consumers; the FWPCA protects the environment. Therefore, consumers need not actually be burned before a carpet which fails to conform with the flammability standard presents public harm.

### 3. *Appellants' Ability to Pay*

The district court concluded that Danube and Hagaman had the ability to pay a monetary penalty of $3,500 per violation. Conclusion 24. The court based this conclusion on its finding that Danube and Hagaman, as 100% shareholder, compiled over

---

any, to which the violation was inadvertent; and (5) the number of violative products.

*In re Imperial Carpet Mills, Inc., supra* note 7, at 60,970. For the most part, these factors are subsumed by the factors listed in *Reader's Digest, supra*; in fact, factors 1 and 2 are relevant in the instant case as to our inquiry into appellants' good faith. *See* Part III.B.1, *infra.*

**11.** Appellants also assert that the district court's ruling should be reversed because the government sought a $10,000 penalty for each violation in its complaint, but the statute and agreement limit the per-violation penalty to $5,000.

Appellants' Brief at 34–37. Because the court assessed a per-violation penalty of only $3,500, and because the $10,000 maximum did not enter into its decision, this court need not address appellants' arguments as to the maximum penalty. Appellants' reliance on *United States v. Papercraft Corp.*, 540 F.2d 131, 139–40 (3d Cir. 1976), is misplaced because, in that case, the trial court assessed a $7,500 penalty. *Id.* at 134.

**12.** Appellants enjoyed a competitive cost advantage in manufacturing Brady style carpet over those companies which endeavored to comply with the flammability standard.

$1.2 million in profits between November 1, 1979 and October 31, 1981, $376,167 between November 1, 1979 and October 31, 1980, and $594,684 between November 1, 1978 and October 31, 1979, and had a net worth of approximately $3.5 million as of October 31, 1981. Appellants contend, however, that these figures have no bearing on appellants' ability to pay, because (1) the relevant gauge of ability to pay is the profit earned from the nonconforming carpet and (2) calculation of net worth should focus on liquid, not illiquid, assets. (Br. at 53).

■ Appellants rely on *United States v. Papercraft Corp.,* 393 F.Supp. 415 (W.D. Pa.1975), *rev'd on other grounds,* 540 F.2d 131 (3d Cir.1976), in support of their contention that the profit from the alleged wrongdoing is the gauge for civil penalties and, because appellants did not profit from "Brady" carpeting, the penalty was excessive. Appellants' reliance on *Papercraft* is inappropriate. That case held that the profit which the corporation receives from the product in question is relevant only in ascertaining the amount of harm to the public, not in determining the wrongdoer's ability to pay. *Id.* at 426. Indeed, *Papercraft* considered the corporation's overall sales and earning capacity in assessing the civil penalty.

■ Appellants next contend the present ability to pay as determined by liquid assets is the relevant inquiry, not a net worth figure contemplating illiquid assets and facilities. Appellants point to testimony which established that Danube is now operating in the red, that the company's cash flow is so poor that Hagaman, as president, did not take a salary in 1981 and that imposition of a large penalty would be "disastrous." Appellants urge, therefore, that the district court's consideration of overall net worth was erroneous because it overestimated appellants' ability to pay a civil penalty. We find no such error. The very portion of the record cited by appellants contains a statement by Hagaman that "we [appellants] frankly, at this point, could come up with $70,000 [the amount of penal-

ties sought by the government in its complaint] without being put out of business." Transcript at 111. In light of such testimony, appellants' contention that imposition of a $24,500 penalty overestimated appellants' ability to pay is not persuasive.

### C. Personal Liability

■ Appellant Hagaman contends that the district court erred in imposing personal liability against him for the civil penalties. In 1972, Hagaman, president of Danube, signed the "Agreement Containing Consent Order to Cease and Desist," which, like the cease and desist order, expressly applies to "Carl D. Hagaman, individually and as an officer of [Danube]." Appellant relies on the CPSC's ruling in *In re Imperial Carpet Mills, supra* note 7, in which the CPSC announced that, at least " 'where the violation ... was inadvertent and not likely to recur,' " the CPSC may not apply a cease and desist order to a corporate officer in his individual capacity " '*unless* the Commission can show some reason for including an officer other than the mere fact that he is an officer.' " *Id.* at 60,967 (quoting *Barrett Carpet Mills v. CPSC,* 635 F.2d 299, 304 (4th Cir.1980) (emphasis Commission's)).

Assuming for purposes of this portion of the opinion only that the violation which led to the cease and desist order was "inadvertent," Hagaman's contention is nonetheless without merit. In both the *Barrett* case and the *Imperial* decision, a corporate officer challenged a cease and desist order which named the officer, in his individual capacity, as a respondent. Unlike the officers in *Barrett* and *Imperial,* Hagaman did not challenge the cease and desist order; in fact, in paragraph 3(c) of the consent agreement, he expressly waived his right to do so. In view of such acquiescence at the time the order was entered, a court cannot now countenance Hagaman's claim that he was improperly named in his individual capacity as a respondent in the cease and desist order. The district court, therefore, did not err in imposing civil penalties against Hagaman personally.

## IV.

Having found no merit in appellants' contentions, the district court's granting of summary judgment and imposition of civil penalties is

AFFIRMED.

Hatchett, Circuit Judge, dissented and filed opinion.